WOLFE, &c.
vs
BATE, &c.

---

CHANCERY.

Case 54.

September 26.

The case stated.

# Wolfe, &c. vs Bate, &c.

## APPEAL FROM THE MEADE CIRCUIT.

*Mortgages. Deeds of Trust. Frauds, statute of. Parties.*

This opinion was rendered on the 26th of September, 1848, by Chief Justice MARSHALL, and was suspended on petition for a re-hearing until the 30th January, 1849, when the petition was overruled.

R. T. ROBERTSON having, in consideration of a large estate conveyed to him by R. T. Bate, undertaken to pay certain debts of the firm of Rooney & Bate, of which R. T. Bate was a member, and being further indebted to him in the sum of $9,700, executed in March, 1835, a note and mortgage for that sum to James Guthrie, who held them for the benefit of Bate. In March, 1838, on a settlement between Robertson and Bate, the former executed to the latter, his note for $5,000, the balance remaining due on said note and mortgage, and received an order upon Guthrie for the note to be delivered to him. Upon the presentation of this order in June, 1839, Guthrie not only surrendered the note, but released the mortgage, conceiving himself authorized to do so by the order for the note. In September, 1838, P. W. Tompkins, claiming authority to collect and arrange several judgments which had been obtained against Rooney & Bate, or Bate alone, for debts of the firm, and on which executions had been returned "no property found," received from Bate, in satisfaction of said debts, and in trust for their payment, the note of Robertson for $5,000, and gave a receipt accordingly. And in the same month, September, 1838, Robertson having paid to Tompkins a small part of this debt, executed to him in his own name, two notes for the resi-

due, and a mortgage for their security, upon the same property, viz: a large number of slaves, which had been mortgaged to Guthrie. Both of these mortgages were duly recorded. That to Tompkins refers to the previous one to Guthrie, and states that it had been agreed between Robertson and Bate upon the execution of the note for $5,000, which had been assigned to Tompkins, that the mortgage to Guthrie should stand as security for that note, as being a part of the debt secured by the mortgage. It does not, however, disclose the character of Tompkins as trustee. But Robertson was at that time fully apprized of his character, and of the nature of the transaction between him and R. T. Bate.

In April, 1842, R. T. Bate filed his bill, stating in addition to the foregoing facts, that notwithstanding the arrangement with Tompkins, and the receipt given by him, several of the creditors therein named had issued executions against him on their judgments, &c., and praying that the mortgage to Tompkins might be foreclosed and the slaves sold, and the proceeds applied to the benifit of the creditors, for whom Tompkins had assumed to act, or for his own benefit, if he should be held bound to pay, &c. In the progress of the suit, the creditors recognizing the act of Tompkins as binding them, claim the benefit of the mortgage, and unite, by cross bills, in the prayer for foreclosure, &c. All proper parties were brought before the Court, and upon final hearing, six only of the mortgaged slaves were decreed to be sold, and the larger number, (including the increase of some of them,) claimed by Anderson and Hall, under distinct purchases from Robertson the mortgagor, and by Mrs. Lucy M. Bate, as trustee of Mrs. Robertson, under the will of James S. Bate, were decreed to be exempt from sale and from the operation of the mortgage, and the bill as to them was dismissed with costs. A large part of the debt being left unsatisfied, Wolfe, and the other creditors for whose benefit Tompkins acted, in taking the note of Robertson and the mortgage on the slaves, have brought the case to this Court, alleging that the decree is erroneous in not giving effect to the mortgage against each of these claims. We proceed to

WOLFE, &c.
vs
BATE, &c.

state and dispose of these several claims in the order in which they have been mentioned.

1. Anderson claims to have purchased the slave decreed to him, between the time when the mortgage to Guthrie was satisfied by the arrangement between Robertson and Bate, and the time of the execution, or recording of the mortgage to Tompkins. But if this were so, still the first mortgage was not in fact released, nor the note for which it was given surrendered or even claimed until long after the date and recording of the second mortgage executed for the same property, and to secure a part of the same debt, and we are satisfied that the transaction between Bate and Robertson did not *ipso facto* operate as a release of the mortgage to Guthrie, either at law or in equity. It certainly was no release at law, and it would not have been one in equity as long as the mortgage in fact existed, unless the benefit of it had been waived or lost by some act of Bate, who was the real beneficiary. There was nothing of the kind by which Bate's equity was destroyed; and as it passed to Tompkins by the assignment of the debt, and the second mortgage was made for the same debt before the first was released, we do not perceive that there was any interval when the mortgagor could have made a sale effectual against both mortgages. The fact, however, of the sale to Anderson having been made before the recording of the second mortgage, is denied and is not established by the proof, which in the absence of the bill of sale, and of any excuse for not producing it, is not entitled to any very liberal inferences in favor of the purchase. And although the second mortgage covered but an equity while the first subsisted, yet as it was made after the act of 1837, (3 *Stat. Law,* 1143,) authorizing the recording of such mortgages and giving them effect in the order of prior ity, it was entitled to prevail over the subsequent sale to Anderson, which itself could pass only an equity, while the legal title was in the first mortgagee. And the release of that mortgage enured to the benefit of the elder equity under the second mortgage.

Where a trustee, without the direction of *cestui que trust*, gave up and released the trust property before the debt was paid, which was intended to be secured by mistake, it did not operate a release in equity of the lien on the property.

WOLFE, &c.
vs
BATE, &c.

Nor has Anderson succeeded in sustaining his claim against the second mortgage, on the ground of the equity set up against Bate, on the allegation that this slave was received from Roberstson, in discharge of a debt of Rooney & Bate, for which if not paid, Bate was liable. This claim against Rooney & Bate could never have been set-off against the claim of Tompkins, or his principals, upon Robertson, and if it was satisfied by one of the slaves which had been included in the mortgage to Tompkins, the loss of that slave by the mortgage, if it could create any equity against Bate, could create none against Tompkins and his principals, who were entitled to the benefit of the mortgage. But we are not satisfied that there is any such equity even against Bate. For if the slave was taken eventually for payment of a debt once existing against Rooney & Bate, the fair presumption, from the facts, is that the claim against Rooney & Bate, which Robertson was bound by his contract with Bate to pay, had long before been merged in the direct undertaking of Robertson to Anderson, and therefore, that the slave was taken in discharge, not of a subsisting demand against Bate, but of Robertson's own debt.

It seems to us, therefore, that there is no sufficient ground for refusing to subject to sale under the mortgage, the slave claimed by Anderson, or to compel contribution according to his value.

2. The slaves claimed by Hall were purchased from Robertson some months after the mortgage to Guthrie had been released, and that to Tompkins duly recorded. These slaves were, therefore, clearly bound by the mortgage, and the ground of exemption stated in the decree is, that they were sold with the consent or knowledge of Tompkins. We are of opinion, however, that the fact is not so made out in the proof. Robertson, the witness relied on for the facts, does not suggest that Tompkins knew of the sale when, or before it occurred. He says he sold to Hall for the purpose of paying the first note to Tompkins, that a part of the price was paid in money, and the rest in notes or claims on others, and that with a part of the money and a part of the

*A debtor who buys a demand against a trustee cannot set off such debt against cestui que trust, to the prejudice of cestui que trust.*

notes, he purchased up notes of Tompkins. He says, "I advised him of the sale—he made no objection to the sale—at the same time I informed him that I had taken up his notes, which I offered to pay him in lieu of my notes." He does not say that he received any answer, but says some time afterwards he heard that his notes were in the hands of H. Smith, of Louisville, for collection for payment of a debt of Tompkins. He also says that his purchase of the notes on Tompkins was made before the first of his own notes fell due, which was in September, 1839. But his bill of sale to Hall, bearing date in January, 1840, shows that he was mistaken, and the time when he advised Tompkins, is thus left wholly uncertain. He does not say how he advised Tompkins of the sale; but the plain inference is, that it was by letter or message. It appears indeed, that about the period referred to, Tompkins removed to a distant State, and there is no evidence that he actually received information of the facts referred to, by Robertson, and certainly none that he ever assented either to the sale, or to the proposed mode of paying off the mortgage debt or part of it, and his order to H. Smith, dated at Vickburg, in April, 1840, directing the payment of a part of the proceeds of the Robertson debt to one of the creditors, for whose benefit he had taken it, is exhibited and proved in the record. We think, therefore, there is no sufficient ground for assuming that the sale to Hall was made with the knowledge of Tompkins, or by his assent or authority, express or implied. But it seems to be supposed that Hall has some equity against the mortgage and the beneficiaries under it, in consequence of the appropriation of the price paid by him, or a part of it, to the purchase of claims upon Tompkins, the mortgagee, which remain unsatisfied. These claims, however, could under no circumstances, have any greater efficacy than to reduce the mortgage debt by way of set-off against the mortgagee, and Half as purchaser from the mortgagor, having such offset, would at most be entitled to a derivative or secondary equity, derived from his vendor. But Robertson knowing that the sale of these mortgaged slaves, was uncon-

scientious as well as invalid, unless for the payment of the mortgage debt, and knowing that that debt, though in the name of Tompkins, was held in trust for others, and could not be paid by claims purchased up against Tompkins, probably then a non-resident, and certainly embarrassed, could not conscientiously claim, or attempt to make payment in that way; and had no equity to set-off such claims against the beneficiaries of the trust for whose benefit he knew his notes, and mortgage to Tompkins were executed. Whence then can Hall derive his equity against these beneficiaries? He purchased with notice, express or implied, of the mortgage, without the knowledge or authority of Tompkins, and has had no communication with him since. He cannot follow the price which he paid into the notes on Tompkins, purchased by his vendor. Neither he nor his vendor has an equity against the beneficiaries of the mortgage. And if he has an equity against Tompkins to credit the mortgage, it must yield to the older equity of the beneficiares, to have it enforced for their benefit. We conclude, therefore, that the slaves purchased by Hall should have been subjected to sale under the mortgage, or to contribution according to their value.

3. The slaves claimed by Mrs. Bate, are Nancy and her children, which she claims under her husband's will, devising Nancy to her in trust for the use of Mrs. Robertson, a daughter of the testator, and the wife of the mortgagor. Nancy had been taken home with Mrs. Robertson from her father's house, when she left it after the birth of her first child, about seven years or more before the death of the testator, which occurred in 1834, and about or near five years before the date of his will. She has remained there ever since, and has been always claimed by Robertson as his own, until some two or three years before this suit was brought he seems to have applied to the trustee to protect her from being taken under an execution against himself. The trustee has never had her in possession, nor was her claim as trustee ever recognized by Robertson, until at least ten years after he had held Nancy as his own property. Against these strong facts, and the state-

A father sent to his daughter upon having her first child, a negro girl, which was permitted to remain there 6 or seven years; during that time she was mortgaged by the son-in-law, when she was brought back and given to a younger daughter, who dying, the father devised her to his wife in trust for the married daughter——Held that she was liable under the mortgage to the creditors of the husband.

BEN. MONROE'S REPORTS.

ments of several of the family, to the effect that Nancy was understood to have been given to Mrs. Robertson by her father at the birth of her first child, and that she belonged to Robertson or his wife, it is claimed that Nancy did not belong to the testator when she was taken to nurse Mrs. Robertson's child, but to a younger daughter, who about five years afterwards died a minor; that the testator had, some, time before the occasion referred to, given her to this younger daughter, who had taken her into the house, and was regarded as her own, and that she was only loaned to Mrs. Robertson. No specific declaration or act of giving to this younger daughter is proved. And without stating more minutely the testimony upon the subject, we deem it insufficient to destroy the effect of the actual delivery of Nancy to Mrs. Robertson, without proof of reservation or condition, and after the long possession of Robertson under claim of ownership, which would have established his title, even against the testator himself, and which, if Nancy had been actually received on loan, would have subjected her to the claims of Robertson's creditors or subsequent vendees. There was doubtless some talk in the family, and probably by the father, of giving Nancy to the younger daughter referred to. But there being no actual gift, nor distinct proof of possession, the recollection of such loose family conversations and intentions are entitled to but little effect against positive acts and a palpable possession. Nor does the clause of the will devising Nancy in trust for Mrs. Robertson, furnish any material inference against the fact of a previous gift to her. If it even tend to prove that the gift may have been intended for her separate use, such an intention could be of no avail against the circumstances which have been stated. The possession of Robertson was sufficient to support his mortgage to Guthrie, and afterwards to Tompkins. And if it were conceded, as contended for by the trustee, that R. T. Bate, either as a devisee under the same will, or as being acquainted with its provisions, or as a party to a deed executed shortly after the testator's death between his heirs and devisees was estopped or in any manner restrained from claim-

ing against this devise of Nancy, and if the mortgage to Guthrie should therefore be deemed ineffectual as to her, neither Tompkins nor his principals or clients could be affected by any such difficulty. They do not assert any claim to Nancy derived from Bate, but under a direct mortgage to Tompkins, to secure a demand, not against Bate, but against Robertson. And Bate being under no liability, either as assignor of the debt on Robertson, or as debtor to the parties entitled under the mortgage, and having no interest whatever in the mortgage claim, there is not a shadow of interdict against the assertion of claim to Nancy under the mortgage. Whether the objection made could affect an interest asserted by, or derived from Bate, need not be decided. It has already been stated that his creditors, in satisfaction of whose judgments Tompkins took the note of Robertson, assigned by Bate, either authorized or have ratified the act, and being bound by it have no claim against Bate. It should be added, that the creditors of Tompkins, for whose security he placed Robertson's notes in the hands of Smith, disclaim all interest, and have, as may be presumed, been otherwise satisfied or secured.

Upon this branch of the case, we are constrained to adopt the conclusion, that the devise in trust for Mrs. Robertson, cannot avail to protect Nancy and her children from the operation of the mortgage, and that they should have been decreed to be sold.

4. Objection is further made to the decree, that it gives no relief against Robertson on account of his having sold and sent out of the State, Leanah and her child, included in the mortgage. But it is not certain that they were not sold under circumstances affording some excuse, and perhaps with R. T. Bate's consent, before the execution of the mortgage to Tompkins, in which her name may have been merely copied from the previous mortgage. And although it be conceded that Robertson was liable to Tompkins for mortgaging property not his own, we are not prepared to decide that this liability is enforcible in equity, in the absence of any special ground of jurisdiction. Besides, Robertson appears to have obtained a discharge in bankruptcy

*No decree* in personam *can be rendered against a discharged bankrupt on account of a mortgage debt due before, and provable under the bankruptcy.*

WOLFE, &c.
*vs*
BATE, &c.
since the sale, and on the whole, we perceive no error in the omission to decree against him personally.

But for the errors above noticed, the decree in favor of Anderson, Hall, and Mrs. Bate, as trustee, is reversed, and the cause remanded, with directions to decree the sale of the slaves claimed by them respectively, as above referred to, or of so many as may be requisite to satisfy the mortgage debt, providing first for the sale of those claimed by Mrs. Bate as trustee, as far as may be necessary, and that the residue of the debt, if any, be made proportionally from the said slaves claimed by Anderson and Hall, if sufficient, or that said Anderson and Hall contribute thereto, if necessary, to the extent of the value of their said slaves respectively, or in proportion to their value, to be ascertained by a commissioner upon evidence, and by inspection if practicable.

*January* 20.     The CHIEF JUSTICE made the following response to a petition for re-hearing.

*Where a trustee represents the interest of the beneficiaries and they were numerous, cross pleadings amongst creditors and beneficiaries not esteemed indispensible parties.*
THE parties interested under and against the mortgage, having all been before the Court in such manner as to be concluded by the decree, and having, in fact, set up and litigated the rights and interests involved in all parts of the controversy, under the concession, express or implied, that the right of enforcing the mortgage upon the property subject to it, was sufficiently asserted by R. T. Bate, in his original and amended bills, and by his creditors, who were the beneficiaries, and this right having been conceded by Tompkins, the mortgagee; and the claimants against the mortgage having in fact, asserted their alleged equities in this form of the suit, as against Bate, and Tompkins and the beneficiaries, who also concurred in the prayer to subject the property to their debts, and in some instances made their answers cross bills against the purchasers from the mortgagor, and in one instance had process served on one of them; we are of opinion that although the suit might have been put in a more formal shape by requiring the claimants against the mortgage to have been before the Court upon the cross bill of each of the beneficiaries or of Tompkins, the mortgagee and their trustee, yet as the former course, owing to the number of the

parties, would have been extremely onerous and inconvenient, and as the latter course is in effect, dispensed with by the consent of Tompkins, that the mortgage may be foreclosed in the suit as it stands, and as all have, in fact, treated Bate as competent to litigate all questions in the case, it is not necessary to the ends of justice, and would be inconvenient after a record of nine hundred pages has been made up in litigating the case in its present form, to send it back merely for the purpose of a formal change in the attitude of the parties. The question as to Mrs. Bate's claim, has more difficulty than as to the others, because she was not made a party by any claimant under the mortgage, but was brought into the suit by the mortgagor on his cross bill, and presents her claim in answer to his cross bill. But as she does not ask to be made a party to the other bills, and was not in possession, and as her claim was, in fact, litigated in the evidence, and is not sustained, there seems to be no more necessity for sending the case back, in order that she might be made a defendant to the original bill, than if she had prayed to be made a defendant by petition, and upon the evidence presented or taken on the petition, it had appeared that she had no interest in the property.

Wherefore, the petition for a re-hearing is overruled.

*A. Harris and Pirtle* for appellants; *Walker & Stuart and Morehead & Reed* for appellees.